UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

**J CO MEDICAL MANAGEMENT, INC.**                    **CASE NO. 02-10076**

DEBTOR                                                CHAPTER 7


**MEMORANDUM OPINION**

Two professionals seek payment from a failed chapter 11 debtor whose brief

reorganization quickly failed in 2002.  Anatole J. Plaisance and Federal Tax Service ("FTS")

claim they rendered services to debtor J. Co. Medical Management, Inc. ("J. Co.") more than

eleven years ago, both before and after J. Co.'s 2002 chapter 11 filing.  Plaisance wants J. Co.'s

estate to pay him for legal services he claims to have rendered even before J. Co. was

incorporated, as well as fees for defending criminal charges against related non-bankrupt entities

after J. Co.'s reorganization was converted to a chapter 7 liquidation.  FTS comes into the

bankruptcy for the first time to obtain approval of its professional employment and payment for

services for a group of entities related to the debtor.

Even had their prepetition and postpetition claims been timely, neither Plaisance nor FTS

carried their burden of proving that J. Co. is liable for their fees.

## Procedural Background

J. Co.'s 2002 reorganization collapsed soon after its January 11, 2002 filing, when the court converted the case to a chapter 7 liquidation on April 16, 2002.[1]  Creditors holding general prepetition claims against J. Co. had until August 28, 2002 to file their claims;[2] more than $905,764 claims are on the register.

After the case converted to a chapter 7 liquidation, Dwayne Murray was appointed trustee ("Trustee") and assumed responsibility for investigating the debtor's financial affairs, collecting property of the estate and examining the proofs of claim.  At the end of his tenure, a trustee must submit a report of his administration of the bankruptcy estate, including his proposed payments to legitimate creditors.[3]

More than six years ago the court approved without objection the trustee's initial "final" report,[4] which included a list of distributions the Trustee proposed to make to J. Co.'s creditors.[5] The court approved the distributions and closed the case in 2007, but preserved as part of J. Co.'s bankruptcy estate the company's interest in Medicare and Medicaid receivables, as well as any

---

[1]  Order Converting Case Under Chapter 11 to Case Under Chapter 7 (P-4).  The meeting of creditors was scheduled for May 28, 2002 (docket entry on April 17, 2002).  Fed. R. Bankr. P. 3002(c) provides that in chapter 7 cases "a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors …."

[2]  Docket entry on April 17, 2002.

[3]  11 U.S.C. §§323, 704(a).

[4]  Bankruptcy Code section 704(a)(9) commands a trustee to make a final report and file a final account of the administration of the bankruptcy estate.  Bankruptcy Code section 350(b) allows reopening of closed cases to administer assets, among other things.  After filing his first "final" report and closing the case, the Trustee collected Medicare and Medicaid receivables that enabled him to make more distributions to creditors, which led to his filing several more "final" reports.

[5]  April 23, 2007 Notice of Trustee's Final Report of Administration of Estate, Report of Receipts and Disbursements, Application for Compensation and Reimbursement of Expenses and Proposed Distribution (P-189). The court approved the trustee's final report on May 21, 2007 (P-191).

receivables due from any of its bankrupt affiliates.[6]  In 2008, the trustee reopened the case to distribute the recoveries from those sources to creditors.  The Trustee filed additional final reports in April 2012[7] and July 2012.[8]  No party in interest objected to any of the additional payments the Trustee proposed to make to creditors and so the court approved the two reports and proposed distributions.

    In contrast, the Trustee's fourth final report[9] filed February 20, 2013 triggered this dispute when it drew opposition from FTS[10] and Plaisance,[11] who contended in virtually identical objections that several claims in the report should not be paid.  Contemporaneously, Plaisance and FTS for the first time sought payment for professional services they claimed to have rendered to J. Co. more than a decade earlier, both before and after J. Co. filed bankruptcy.  Neither had taken any prior action to preserve their prebankruptcy claims or secure payment for work they claim to have performed after the bankruptcy case started.  The Trustee objected to all their demands for payment and related relief.

---

[6]  August 21, 2007 Order Approving Account, Discharging Trustee and Closing Estate (P-194).  The court had previously approved the filing of the trustee's final report allowing the limited abandonment of estate assets (P-186).  Had it not done so, by operation of law the assets would have been abandoned to J. Co.  *See* 11 U.S.C. §554(c).

[7]  P-241.

[8]  P-247.

[9]  P-274.  The Notice of Final Report (P-277) mailed to the parties on the mailing list on February 25, 2013 includes a summary indicating that the allowed general unsecured claims would receive only 15.2% of the full amount of their claims.

[10]  P-294.

[11]  P-296.  The record shows that the Trustee mailed Plaisance notice of every final report he prepared.  All the claims to which Plaisance objected were listed in those earlier final reports, along with the Trustee's proposed distribution to each claimant.  Until the most recent final report, unsecured claimants were shown as receiving nothing on their claims.

# Facts

I.     *Anatole Plaisance*

    a.  *Plaisance Worked for Julian Rish and Affiliated Entities*

Julian Rish owned approximately 92% of the stock of The J. Rish Group, Inc. ("Rish Group").  J. Co. was a Rish Group subsidiary and managed financial affairs for other subsidiaries.[12]

Plaisance is no stranger to Julian Rish, his enterprises or their bankruptcies.  He was the secretary of and a minority shareholder in Rish Group,[13] as well as the secretary/treasurer of debtor J. Co.[14]  He also served as general counsel[15] for Rish's companies before they sought

---

[12]  DeWitt Weaver, the general manager of FTS, testified that J. Co. was the "money manager" for all of Julian Rish's companies.  The other companies (along with their bankruptcy filing information) include The J. Rish Group, Inc., Case No. 02-11580 in the Middle District of Louisiana ("MDLA") (originally filed April 30, 2002 in the Southern District of Mississippi ("SD Miss."); Monroe Regional Acute Rehab Hospital Inc., Case No. 02-11573 in MDLA (originally filed January 16, 2002 in SD Miss.); Tylertown Health & Fitness, Inc., Case No. 02-11571 in MDLA (originally filed January 15, 2002 in SD Miss.); Northeast Louisiana Outpatient Rehab of Monroe, Inc., Case No. 02-11575 in MDLA (originally filed January 16, 2002 in SD Miss.); Northeast Louisiana Outpatient Rehab Services, Inc., Case No. 02-11577 in MDLA (originally filed January 16, 2002 in SD Miss.); Feliciana Outpatient Rehabilitation Services, Inc., Case No. 02-11576 in MDLA (originally filed January 16, 2002 in SD Miss); Magnolia Outpatient Rehabilitation Services, Inc., Case No. 02-11562 in MDLA (originally filed January 15, 2002 in SD Miss.); Southwest Mississippi Outpatient Rehab of Port Gibson, Inc., Case No. 02-11566 in MDLA (originally filed January 15, 2002 in SD Miss.); Southwest Mississippi Outpatient Rehabilitation of Gloster, Inc., Case No. 02-11567 in MDLA (originally filed January 15, 2002 in SD Miss.); Southwest Mississippi Outpatient Rehabilitation Services, Inc., Case No. 02-11569 in MDLA (originally filed January 15, 2002 in SD Miss.); Southern Chiropractic and Sports Rehabilitation Center, Inc., Case No. 02-11574 in MDLA (originally filed January 16, 2002 in SD Miss.); Feliciana Fitness Center, Inc., Case No. 02-11578 in MDLA (originally filed January 16, 2002 in SD Miss.); Baton Rouge Outpatient Rehab, Inc., Case No. 02-11579 in MDLA (originally filed January 16, 2002 in SD Miss.); and several debtors in Mississippi bankruptcy courts: Southwest Mississippi Rehab of Natchez, Inc., Vicksburg Regional Outpatient Rehab of MS, Inc., Feliciana Regional Rural Health Clinic, Inc., Central Mississippi Regional Outpatient Services, Inc., Southwest Mississippi Outpatient Rehabilitation Services of Tylertown, Inc., Gulf Coast Rehab, Inc. and Rivers Edge Fitness & Rehab, Inc.

[13]  Statement of Financial Affairs for Debtor Engaged in Business, question 21(b), page 24 of 33 (P-2) filed in *In re The J. Rish Group, Inc.*, No. 02-11580 in the United States Bankruptcy Court for the Middle District of Louisiana.

[14]  J. Co. Statement of Financial Affairs, question 21(b), page 42 of 45 (P-18).

[15]  The parties stipulated that Plaisance, who was admitted to practice law in Louisiana in 1961, was J. Co.'s general counsel before its bankruptcy.  Plaisance testified that his annual salary was $85,000 but that he received only part of the salary in each of the years before bankruptcy.  The parties also stipulated to the amount of Plaisance's proof of claim for his salary as J. Co.'s general counsel from 1998-2001 (claim 26).  However, the Trustee did not stipulate that Plaisance had a wage claim entitled to priority under Bankruptcy Code section 507(a)(4).

bankruptcy protection; represented Rish in his chapter 7 bankruptcy; was a creditor in Julian Rish's personal bankruptcy;[16] and even defended Rish in a federal health care fraud prosecution for actions relating to another Rish affiliate, Monroe Regional Acute Rehabilitation Hospital, Inc.[17]

### b. Plaisance's Proofs of Claim

Plaisance filed a proof of claim[18] on April 15, 2013 that he later amended,[19] seeking $302,500 for prepetition legal services between 1998 and 2001. The description of legal services supporting the claim reflects Plaisance's role as counsel for *all* Rish Group entities, not just J. Co.[20] Still, Plaisance insists that he really was working for J. Co. during that period and so testified at length about his pre-bankruptcy services to the debtor from 1998 to 2001.[21]

---

[16]  *Matter of Julian P. Rish*, No. 02-13145 in the United States Bankruptcy Court for the Middle District of Louisiana, chapter 7 petition filed November 5, 2002, Schedule F (P-8).

[17]  *United States of America v. Julian P. Rish*, Cr. No. 05-30017, United States District Court for the Western District of Louisiana, Monroe Division. The April 7, 2005 Minutes of Court admitted into evidence as part of Exhibit Plaisance 3 reflect that Plaisance was representing Julian Rish, and not J. Co. Plaisance testified that the government had not indicted J. Co. in the health care fraud case.

[18]  Claim 26-1.

[19]  Claim 26-2. The claim included documents styled "General Description of Legal Services Performed as General Counsel" for the enumerated calendar years, but no detailed time records.

[20]  Plaisance testified that his wife helped him prepare the yearly descriptions of his work, which do not purport to be J. Co.'s business records or be based on records J. Co. maintained, or even prepared contemporaneously with the services. Plaisance neither proved when they were prepared nor offered any documentary evidence or testimony corroborating any aspect or the accuracy of the summaries. They are entitled to no evidentiary weight.

[21]  J .Co. was not even incorporated until February 2000, according to the Supplemental Application to Employ Counsel for Debtor (P-22) filed by Katherine Wheeler. That document recited that J. Co. was incorporated in February 2000 "to centralize and more efficiently furnish all management" and other services for Rish's collection of companies. The court also takes judicial notice of the records of the Louisiana Secretary of State indicating that J. Co. was registered as a corporation on February 11, 2000. Fed. R. Evid. 201(b) and (c) (permitting judicial notice of a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") Plaisance did not explain at trial how J. Co. could be liable for payment of any services he may have rendered before its incorporation.

Plaisance filed a second claim for $75,000 for legal services for the period between 1999 and 2001,[22] though at the hearing Plaisance testified that the claim actually was for his postpetition services between 2002 and 2005.[23]  Plaisance now contends that his services defending Julian Rish in the federal health care fraud case between 2002 and 2005 benefitted J. Co., and therefore that this bankruptcy estate should pay them as an administrative expense.[24]

The Trustee, who is the representative of the bankruptcy estate,[25] testified that he was not aware of any ongoing criminal investigation of J. Co. in 2002.  No evidence supports a finding that the Trustee knew, hired, endorsed or supported Plaisance's efforts on Julian Rish's behalf, or that Plaisance made the Trustee aware of them at the time.

c.   *Plaisance Knew of J. Co.'s Bankruptcy Filing in Early 2002*

The evidence established that Plaisance knew of the J. Co. bankruptcy long before the deadline for filing timely proofs of claims.

Plaisance admitted at trial that he knew of J. Co.'s bankruptcy no later than February 2002, more than 11 years before he filed his first proof of claim in April 2013 and nearly fifteen years after the earliest services for which he now demands payment.  Plaisance also admitted on cross examination that he knew J. Co. planned to file bankruptcy; and specifically knew that the debtor had filed a petition in this court because Cheryl Parino, a J. Co. employee, had contacted Plaisance for information for J. Co.'s schedules.

---

[22]  Claim 27-1.  No supporting documents whatsoever accompanied proof of claim 27-1.

[23]  Plaisance offered Exhibit Plaisance 3, "General Description of Legal Services Performed as Counsel for Julian Rish, JCO Medical Management, Inc. and Monroe Acute Rehab Hospital, Inc. in Criminal Prosecution" in support of claim 27-1.  The exhibit does not include any detailed time records supporting the $75,000 bill.

[24]  Plaisance relies on 11 U.S.C. §503(b)(3)(C), conferring administrative priority on creditors' claims "in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor."  Administrative priority claims are paid first in the order of distribution of estate property outlined in 11 U.S.C. §726, and must be paid in full before any payment on other creditors' claims.  Administrative claims if allowed thus may reduce or eliminate funds available to pay claims that are not entitled to priority.

[25]  *See* footnote 3, above.

Perhaps more significant to weighing the issue of timeliness, the evidence established that Plaisance actually witnessed the hearing at which the court formally concluded that J. Co.'s reorganization had failed.  Specifically, Plaisance admitted on cross examination that he was sitting in bankruptcy court the day the court converted the reorganization case to a chapter 7 liquidation – April 12, 2002.

Finally, Plaisance also knew that the Trustee had made two prior distributions to creditors.  On cross-examination he also conceded that he'd known of his claim against J. Co. "for a long time" but was waiting to see if money became available to pay it.  Thus he possessed facts that should have prompted action long before his 2013 claim filing.

### d.  Plaisance was appointed Trustee's Special Counsel in 2010

Plaisance's delay in submitting his claims also is puzzling because of his earlier involvement in this case as a professional to collect the money that made the additional distribution possible.  Specifically, J. Co.'s bankruptcy trustee hired Plaisance as special counsel in 2010[26] on a contingent fee basis to collect outstanding Medicare receivables.[27]  Plaisance's verified statement in support of the Trustee's application recited under oath that Plaisance was "a putative creditor of Debtor's estate for unpaid legal expenses," though the statement did not disclose that he was also the debtor's secretary/treasurer or that he represented Julian Rish personally or any of the affiliated Rish companies.[28]  Plaisance was paid $126,524.25 for that

---

[26]  *See* 11 U.S.C. §327(e).

[27]  February 10, 2010 Trustee's Application for Order Pursuant to 11 U.S.C. §327(e) Authorizing Employment for Specified Special Purpose (P-207); February 4, 2010 Order Authorizing Employment of Anatole J. Plaisance as Special Purpose Attorney for Trustee (P-210).

[28]  Bankruptcy Code section 327(e) specifies that special counsel cannot "represent or hold any interest adverse to the debtor or the estate with respect to the matter on which such attorney is to be employed."  Fed. R. Bankr. P. 2014 requires that an application to employ a professional under 11 U.S.C. §327 state the professional's connections "with the debtor, creditors, any other party in interest," and that the verified statement of the person to be employed contain a similar statement.  Plaisance's verified statement accompanying the Trustee's application to employ him

work.[29]  Still, Plaisance took no action to make any claim despite his role in collecting the

additional funds that made more payments to creditors possible.

    II.    *Federal Tax Service*

            a.    *FTS Began Working for Julian Rish and his Affiliates Before J. Co. Filed*
                  *Bankruptcy.*

    Federal Tax Service filed its $52,461.25 proof of claim for "financial consulting, tax and

accounting work for Debtor" on April 10, 2013.[30]  FTS claims payment for that part of its

services to the chapter 11 debtor postpetition as an administrative priority expense under 11

U.S.C. '507(a)(2).[31]  FTS also filed an application to be employed retroactively – commonly

referred to as *nunc pro tunc* approval – as a tax consultant for the estate.  Bankruptcy court

approval of a professional's employment is a prerequisite to payment of professional fees from a

bankruptcy estate on these facts.[32]

    DeWitt Weaver, Federal Tax Service's general manager,[33] began working with Julian

Rish in 1999.  Rish retained FTS because Rish Group, J. Co.'s parent and the holding company

for Rish's affiliates, had not filed tax returns for several years.  In exchange for a $10,000

---

recited only that he had no "connection with or any interest adverse to the Debtor, the Trustee, any creditors, or any other party in interest … as to the matters for which I am being employed."

[29] January 24, 2013 Order awarding fees and approving reimbursement of expenses (P-268).

[30] Claim 25-1.  The proof of claim is for "legal services rendered in civil litigation."  The invoices attached to claim 25-1 list services beginning October 1, 2001 and ending May 2, 2002.  FTS amended its proof of claim on May 15, 2013 (Claim 25-2) to recite it sought payment for "financial consulting, tax and accounting work."  Weaver at trial waived that portion of FTS's claim for work before J. Co. filed bankruptcy.

[31] Administrative claims include those for bankruptcy estate professionals' compensation and reimbursement.  *See* 11 U.S.C. §503(b)(2).

[32] Motion for Employment of Tax Consultant Nunc Pro Tunc and Application for Compensation by Tax Consultant and Accountant (P-292) filed by FTS on March 21, 2013.  Bankruptcy Code section 330 allows reasonable compensation to professionals employed by the debtor-in-possession or trustee under 11 U.S.C. §327(a).

[33] Weaver is an enrolled agent authorized to represent taxpayers before the Internal Revenue Service.  FTS's staff did include a certified public accountant, Mary Jane Dixon.

monthly fee, FTS agreed to prepare and file tax returns for various Rish Group companies for tax years 1997 through 2000.[34]   FTS was gathering information for the 2001 returns when J. Co. filed its chapter 11 case.  Weaver testified that FTS stopped working for J. Co. in May 2002 because it was not being paid.

> b. *FTS Failed to Secure Bankruptcy Court Approval to Work for J. Co. During the Chapter 11 Case.*

Weaver testified that he learned of J. Co.'s bankruptcy filing in a January 7, 2002 meeting with Julian Rish and Katherine Wheeler, the debtor's putative counsel.  FTS does not dispute that it never had a written employment agreement with J. Co.; that it did not obtain bankruptcy court approval of its employment; and that FTS took no other steps to obtain payment between mid-2002 and 2013.  Instead, it contends that Wheeler, who failed to obtain court approval to act as J. Co.'s counsel in the chapter 11 case,[35] agreed to pay FTS from her fees.[36]  FTS contends that it should not be penalized for Wheeler's failing to obtain bankruptcy court permission for J. Co. to hire FTS.

Weaver testified that he had never before been involved in a bankruptcy case and therefore relied on Wheeler, who did not inform him that the court had to approve FTS's employment.  Weaver also claimed that he first learned that J. Co. could only hire FTS with

---

[34]  Weaver's testimony concerning the dates he worked for J. Co., like Plaisance's, casts doubt on his credibility because J. Co was not even incorporated until February 2000.  *See* footnote 21, above.

[35]  Bankruptcy Code section 327(a) requires court approval of a debtor- in-possession's employment of professionals.  The court denied Ms. Wheeler's application to be employed as debtor's counsel.  April 9, 2002 Order Denying Application to Employ Attorney (P-43).  Had Wheeler been employed as debtor's counsel, an agreement to share her fees with FTS would have violated 11 U.S.C. §504(a), which provides that an attorney receiving compensation under 11 U.S.C. §503(b)(2) as a professional employed by the debtor "may not share or agree to share – any such compensation … with another person … ."

[36]  Weaver actually testified on cross-examination that Wheeler *guarantied* she would pay FTS's fees.

court approval at the end of 2012, ten years after FTS allegedly worked for the J. Co. bankruptcy estate.

### c. FTS Worked for Many Different Rish Entities During the Time it Claims J. Co. was Responsible for its Fees.

As with Plaisance, FTS's relationship with Julian Rish and his companies casts doubt on FTS's claim that J. Co. alone is responsible for paying FTS.  Weaver admitted on cross-examination that the Rish Group had 25 or 26 affiliates and subsidiaries in three states and conceded that not all of FTS's work was performed for J. Co.  The invoices FTS offered in support of its claim do nothing to clarify why J. Co. is responsible for those fees.[37]

Correspondence between Weaver and Wheeler during summer 2002 reflects this and in fact reveals the nature of FTS's tax work and supports a finding and conclusion that Julian Rish, and not J. Co., was the principal intended beneficiary of FTS's work.  The letters repeatedly describe the consequences for failing to file federal tax returns, not to J. Co., but to Julian Rish *personally* and to Rish Group.[38]  For example, Weaver's June 3, 2002 letter to Wheeler claimed that Rish and Weaver had a "gentleman's agreement" that Rish would pay FTS $10,000 for work to bring *Rish* into compliance with federal laws.  The same letter explained that Rish Group and its subsidiaries had filed no federal tax returns since their inception and recited that "Mr. Rish became my primary client … ."

---

[37]  The invoices were not contemporaneously prepared.  Weaver testified on redirect examination that his invoices for FTS's work were only prepared in 2002 when Ms. Wheeler asked for them.  The evidence supports the finding that FTS's October 1, 2001 – January 15, 2002 statement (Exhibit FTS 2) was based on Weaver's *reconstruction* of the time he and other FTS personnel spent working for Rish's group of companies.  Weaver testified that the time records and invoices were prepared from computer records he had at the time but no longer possesses.  They are entitled to little weight given FTS's failure to prove their reliability and accuracy.

[38]  Letters from DeWitt Weaver to Katherine Wheeler dated June 3, June 26, July 25 and August 14, 2002 (Exhibit FTS 3).

Similarly, Weaver's June 26, 2002 letter to Wheeler explained that Weaver performed services for many different entities that Rish controlled directly or through the Rish Group, and explained that it was not necessary to document his (Weaver's) time because he changed tasks "several times within any given hour … for over 40 different corporations, some of which were and some not part of the J. Rish Group," and so "time records were never part of [FTS's] arrangement with Julian."  In like manner, Weaver's July 25, 2002 letter to Wheeler describes FTS's work by referring to tax returns for "all corporations within the J. Rish Group, Inc." Finally, Weaver's August 14, 2002 letter to Wheeler states: "Mr. Plaisance represents Julian on other legal matters and has knowledge of Julian's activities *outside of the J. Rish Group, Inc.*," and "I will be unable to guarantee a timely completion of the Federal Form 1120 *for the J. Rish Group, Inc.* … "(Emphasis added).

On November 5, 2002, Julian Rish filed a personal chapter 7 bankruptcy case, represented by Plaisance, as debtor's counsel.[39]  Weaver admitted that he received notice of the filing of that case.  FTS was listed as one of Julian Rish's creditors on the sworn first amended list of creditors and first amended mailing matrix.[40]  Julian Rish swore in those documents, which Anatole Plaisance filed on his behalf, that FTS was working for Rish, and by implication not for J. Co.

---

[39]  See footnote 15, *supra.*

[40]  Amendment to List of Creditors (P-14); Amended Mailing Matrix (P-15).

**Law and Analysis**

I.    *Timeliness of Claims*

    a.  *Plaisance's Prepetition and Post Petition Claims are Inexcusably Untimely*

Bankruptcy Code section 726(a) establishes the priority for payment of allowed claims in a chapter 7 case.[41]  Because Plaisance filed his claim nearly eleven years after the August 28, 2002 claims bar date, his prepetition claim is entitled to be treated at best as a late-filed claim under 11 U.S.C. '726(a)(2)(C) or (a)(3), and therefore eligible for distribution only after all timely filed claims are satisfied.  This is an issue apart from the validity of the claim, discussed in detail below in section II(b).

Tardy claims falling with section 726(a)(2)(C), so-called "no-notice" late claims, receive a slightly higher distribution priority over other late-filed claims held by creditors who had notice of the bankruptcy filing.  Plaisance's claim would only qualify as a tardily filed claim under section 726(a)(2)(C) if he "did not have notice or actual knowledge of the case in time for timely filing" of his claim and his proof of claim was "filed in time to permit payment."

Plaisance offered no credible explanation for his tardiness in filing the prepetition claim. The facts support the finding and conclusion that Plaisance knew about J Co.'s bankruptcy not long after its filing in 2002, knew of the conversion to chapter 7, and deliberately failed to act to preserve his prepetition claim until 2013 in the belief that the bankruptcy estate lacked the funds to pay the claim.  Because Plaisance had actual knowledge of the J. Co. bankruptcy his

---

[41]  Sections 726(a) (1) through (5) provide that estate property is distributed as follows: first, to priority claims of the kind listed in 11 U.S.C. §507 (in the order specified in that statute) that are either timely filed or tardily filed under the requirements of §726(a)(1)(A) or (B); second, to timely filed unsecured claims or tardily filed unsecured claims if the claimant had no notice or actual knowledge of the filing of the bankruptcy case; third, to all other tardily filed unsecured claims; fourth, to claims for fines, penalties, forfeitures or damages; fifth, to claims in payment of interest; and sixth, to the debtor.

prepetition claim does not fall within §726(a)(2)(C).  Thus, even if he has an allowable

prepetition claim, it is merely a late claim entitled to distribution under section 726(a)(3).[42]

Plaisance argues for relief from the consequence of his indifference by claiming that his

prepetition claim for salary as J. Co.'s general counsel is a priority wage claim under 11 U.S.C.

§507(a)(4).  To be a valid wage claim under 11 U.S.C. §507(a)(4), Plaisance must have earned

the salary within 180 days before the January 11, 2002 bankruptcy petition.  Assuming for the

sake of argument that Plaisance does have a claim against J. Co., he arguably earned at most only

six months of the claim in that period and so the remainder of the claim is not entitled to

§507(a)(4) priority status.[43]  Additionally, Plaisance did not offer any evidence from which it is

possible to determine the specific amount of legal work he performed for J. Co. in the six months

before it filed chapter 11.[44]  His invoices neither identify the company for which he worked, nor

the specific amounts allegedly earned performing those services during the applicable period.  In

summary, Plaisance did not prove his entitlement to a prepetition priority wage claim.

In any event, even if Plaisance had established a priority wage claim, that claim would

not be entitled to distribution because it was not timely filed, or tardily filed as prescribed in 11

---

[42]  Plaisance's delay is prejudicial to creditors beyond merely reducing the amount they might receive (see footnote 9, above).  Had Plaisance filed a timely claim, the Trustee could have objected to its payment under 11 U.S.C. §502(d) because Plaisance received pre-bankruptcy transfers that were avoidable under 11 U.S.C. §§544 or 548, as explained in this opinion.  *See* footnote 55, below.  The deadline for filing avoiding actions has passed, *see* 11 U.S.C. §546(a)(1)(A), barring the Trustee from objecting to the claim on that basis.

[43]  At trial, the Trustee stipulated *only* that Plaisance was employed as J. Co.'s general counsel at an annual salary of $85,000.  He did not stipulate the claim was a wage claim.  Plaisance's post trial memorandum mischaracterized the stipulation, reciting that the "Trustee announce [sic] in clear and direct terms that Mr. Plaisance's claim was now collectible as a wage claim under 11 U.S.C. §504(a)(4)(a) … ."  Post Trial Memorandum in Support of Motion for Employment of Tax Consultant Nunc Pro Tunc and Accountant Nunc Pro Tunc and in Support of Claims Numbers 25, 26 and 27, p. 9 (P-396).

[44]  Plaisance offered evidence that he received some sums from J. Co. during the six month period immediately before J. Co filed bankruptcy.  J. Co. checks payable to Plaisance attached to Exhibit Plaisance 2 encompass the period from July 2001 to December 2001.  However, Plaisance offered no corroborating evidence that the checks were in payment for work he performed during the same period.

U.S.C. §726(a)(1)(A).  Bankruptcy Code section 726(a)(1)(A) allows for payment of late-filed section 507 claims in preference to even timely filed unsecured claims *only* if the section 507 claim was filed on or before "*the earlier of*" ten days after the mailing of the trustee's final report summary or the date of commencement of final distribution. (Emphasis added.)  The trustee mailed the summary of his latest final report on February 25, 2013[45] and Plaisance filed his claim for salary on April 15, 2013, well beyond the ten-day period set forth in section 726(a)(1).

Finally, Plaisance argues that 11 U.S.C. §503(b)(3)(C) and §503(b)(4) entitle him to a priority administrative expense claim against J. Co. for legal fees for his postpetition defense of Julian Rish in the Medicare fraud case.  Assuming for the sake of argument that his fees fell within those Bankruptcy Code provisions (an issue addressed below in section II(a)), he failed to preserve their priority status by only filing the claim on April 15, 2013, well after the ten-day period that §726(a)(1)(A) establishes for tardy filing of priority claims under 11 U.S.C. §507.

b.  *FTS's Request for Nunc Pro Tunc Employment by J. Co. is Without Merit*

FTS initially sought payment for services it claims to have rendered J. Co. both before and after the chapter 11 commenced but more than eleven years before FTS filed its claims.  It attempted to avoid a timeliness challenge by waiving the prepetition part of its claim at trial, instead characterizing the entire claim as an administrative expense claim for compensation as a professional employed by the chapter 11 bankruptcy estate.[46]

---

[45]  The certificate of service (P-278) recites that the trustee mailed the Notice of Trustee's Final Report to Plaisance on February 25, 2013.

[46]  In fact, FTS also seeks payment for 33.5 hours of work performed after the case converted to a chapter 7 liquidation.  Exhibit FTS 2, p. 14.  After conversion, a newly appointed chapter 7 trustee normally obtains court approval to hire his own certified public accountant, if an accountant's services are needed.  Here, the Trustee hired Postlethwaite & Netterville.  February 4, 2009 Order Authorizing Employment of Ed Starns and Postlethwaite & Netterville as Accountants for Trustee (P-205).

FTS's failure to obtain prior bankruptcy court approval for its employment as an estate professional during the chapter 11 case under 11 U.S.C. '327(a) is an obstacle to its claim. Bankruptcy court approval of professional employment is a prerequisite for FTS's entitlement for payment as a priority administrative expense under 11 U.S.C. §507(a)(2).

FTS prudently does not argue that it needn't have sought court permission to be employed because professionals may be compensated for work for a chapter 11 debtor-in-possession only if they previously have been hired with bankruptcy court approval. *Matter of Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir. 1983) (generally describing requirements of 11 U.S.C. §327(a)); *In re Action Video, Inc.*, 2003 WL 21350081 (Bankr. M.D.N.C. June 9, 2003) (accountants preparing debtor's tax returns postpetition without prior court approval were not entitled to compensation from the estate); *In re Wake*, 222 B.R. 35 (Bankr. W.D.N.Y. 1998) (accountant that had prepared tax returns at debtor's request not entitled to compensation absent prior court approval of employment). Instead it blames this omission on Katherine Wheeler, who herself failed to win court approval to work for the chapter 11 debtor in possession. Accordingly, FTS now asks for retroactive – *nunc pro tunc* – approval of its hiring. A court's "equitable powers may permit nunc pro tunc appointment in *rare or exceptional circumstances*," but the Fifth Circuit has been cautious not to "encourage any general non-observance of the contemplated preemployment court approval." *Matter of Triangle Chemicals, Inc.*, 697 F.2d at 1289 (emphasis added).

The most significant fact bearing on FTS's request is the extraordinary delay between the time it claims to have rendered services for which it seeks payment, the date it learned that J. Co. had filed bankruptcy, and its eventually moving for approval of employment in 2013. FTS has pointed to no reported opinion approving professional employment eleven years after the

services were rendered.

FTS's inaction for more than a decade after it learned that J. Co. had collapsed is inexplicable. FTS knew by mid-2002 that it was not being paid and found itself unable to obtain information from Katherine Wheeler. FTS also undeniably knew by early November 2002 that Julian Rish himself had filed bankruptcy. Those developments should have prompted FTS to act to protect its right to payment for work it did on behalf of Rish and his companies, including this debtor. FTS was ultimately responsible for obtaining approval for its employment by the chapter 11 debtor.[47] Had it applied for approval of employment in 2002, the bankruptcy court would have considered among other things the necessity of its services to J. Co.'s estate and the amount FTS planned to charge J. Co. (in this instance, FTS seeks more than $52,000 for 7 months' work). In the employment process, the court and parties in interest normally would have learned of FTS's divided loyalties, which likely would have disqualified it for employment.

Instead, FTS's motion admits that it did not file a claim against the estate because "there were no assets to pay any fees."[48] It elected not to pursue employment, reconsidering its decision only when it learned that the Trustee had funds to distribute. That delay militates against the effective administration of bankruptcy cases because trustees must know of claims against the estate early in their administration. Decisions such as viability and settlement value of avoiding actions, sales prices for estate assets, and the prudence of incurring professional fees

---

[47] FTS's ignorance of the need to obtain court approval of its employment is not an excuse, even for a non-attorney professional. *See* e.g. *In re Carolina Sales Corp.*, 45 B.R. 750, 755 (Bankr. D.N.C. 1985) (management consultant's ignorance of the Bankruptcy Code requirement for prior court approval of professional by chapter 11 debtor was insufficient to excuse failure); *In re Doctor's Hospital, Inc.*, 117 B.R. 38, 40 (Bankr. D.P.R. 1990) (accountant's ignorance of necessity of employment application was not sufficient to warrant *nunc pro tunc* employment); and *In re Rheam of Indiana, Inc.*, 137 B.R. 151, 162 (Bankr. E.D. Pa. 1992) (auctioneer's ignorance of Bankruptcy Code requirement to obtain court approval before working for the estate was "not to be rewarded" by *nunc pro tunc* appointment.)

[48] Motion for Employment of Tax Consultant Nunc Pro Tunc (P-292), p.2, ¶3.

to pursue claims of the estate all require that trustees know of the universe of claims against an estate. Creditors that know of a pending bankruptcy yet delay making formal claims against the estate hamper a trustee's performance of his duties, to the prejudice of diligent creditors.

FTS is not entitled to employment as a professional *nunc pro tunc* on these facts and consequently is not entitled to an administrative expense claim. "[E]quity aids the vigilant and not those who slumber on their rights." *National Assoc. of Government Employees v. City Public Service Board of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994).

II.     *Neither Plaisance Nor FTS Hold Valid Claims Against J. Co.*

Apart from considerations of timeliness of their claims, the evidence supports a finding and conclusion that neither Plaisance nor FTS hold allowable claims against J. Co.

a.     *Plaisance Did Not Establish his Right to Recover Legal Fees for the Defense of Julian Rish on Medicare Fraud Charges*

Bankruptcy Code §§503(b)(3)(C) and (b)(4) confer administrative expense status on claims for compensation for professional services rendered by an attorney for a "creditor in connection with the *prosecution* of a criminal offense relating to the case or to the business or property of the debtor." (Emphasis added.) These provisions do not give Plaisance a right to any payment.

First, Bankruptcy Code section 503(b)(3)(C) allows only *creditors*[49] to recover their expenses. Should the creditor's expenses include fees of an attorney *for that creditor*, those may be recoverable under §503(b)(4). Plaisance contends that he is a creditor and so argues that section 503(b)(4) entitles him to recover fees for acting as his own lawyer in defending Julian

---

[49] *Creditor* is defined in 11 U.S.C. §101(10) as an entity that "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor**.**

Rish, an insider of the debtor, on Medicare fraud charges.  That construction conflates sections 503(b)(3)(C) and (b)(4).[50]

Second, even if Plaisance were entitled to recover fees on the theory that he was acting as his own attorney defending Julian Rish,[51] jurisprudence construing section 503(b)(3)(C) establishes that the expenses eligible for payment must be connected to a creditor's efforts to *initiate* a criminal prosecution that relates to the bankruptcy case or the debtor's business or property.  The reported opinions considering application of this subsection of 503 address expenses creditors incurred in their efforts to *initiate* prosecution of suspected criminal activity by the debtor or the debtor's principals.[52]  No reported opinions applying §503(b)(3)(C) have allowed recovery of expenses of criminal *defense* for the debtor, much less for criminal defense of the debtor's principal.  *See In re Summit Metals, Inc.*, 379 B.R. 40, 59 (Bankr. D. Del. 2007) (creditor's expenses incurred in initiating a criminal *prosecution* against the debtor's *principal* not allowable under section 503(b)(3)(C)).  Moreover, in general the sections of the Bankruptcy Code conferring priority status are strictly construed so that the estate is preserved for the benefit

---

[50]  Courts applying sections 503(b)(3) and 503(b)(4) consistently have separated the entity incurring the expenses allowable under §503(b)(3) from the professional whose fees may make up part of those expenses.  Some courts require the creditor who incurred the expenses to apply for the administrative expense under §503(b)(4).  *See, e.g., In re Olsen*, 334 B.R. 104, 107 (Bankr. S.D.N.Y 2005).  Other courts have allowed a professional to make the application under section 503(b)(4), but on its client's behalf.  *See, e.g., In re Mirant Corp.*, 354 B.R. 113, 140 (Bankr. N.D. Tex. 2006).

[51]  Plaisance's "time records" purportedly offered  in support of his claim for fees defending Rish consists of a one-page general description of the services he rendered from 2002 to April 2005 with no specifics and a request for payment of the $75,000 "agreed upon" retainer.  Exhibit Plaisance 3.

[52]  *See, e.g., In re Summit Metals, Inc.*, 379 B.R. 40 (Bankr. D. Del. 2007) (chairman of unsecured creditors committee assisted United States Attorney in formulating indictment against debtor's principal for misappropriation of insurance proceeds); *In re Petit*, 291 B.R. 582 (Bankr. D. Maine 2003) (creditor provided information to court and others resulting in criminal investigation and prosecution of the debtor for fraud); and *In re Fall*, 93 B.R. 1003 (Bankr. D. Oregon 1988) (unsecured creditor funded trustee's attorney's investigation that led to debtors being reported to the United States Attorney for bankruptcy fraud).

of more creditors. *In re Federated Department Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir. 2001);

*In re Commercial Financial Services, Inc.*, 246 F.3d 1291, 1293 (10th Cir. 2001).

Finally, even assuming for the sake of argument that Plaisance correctly construes section

503(b)(3)(C), no credible or corroborated evidence established a direct connection between his

defense of Julian Rish in the criminal case and the debtor's reorganization. Plaisance's testimony

that his work in connection with the defense of Rish in the Medicare criminal fraud prosecution

allowed the trustee to later collect Medicare receivables owed to the debtor J. Co. was self-

serving and uncorroborated. In sum, Plaisance has not established a valid claim under

Bankruptcy Code sections 503(b)(3)(C) and (b)(4).

Although this outcome may seem harsh, Plaisance has no basis for complaint because he

was treated fairly for his work as special counsel for the Trustee during the case. Plaisance

received more than $125,000 for his services as special counsel collecting Medicare

receivables.[53] Allowance of an administrative expense for Plaisance's criminal defense of Rish

would be double dipping because his rationale for demanding that J. Co. pay for his services

defending Rish was that it led to J. Co.'s collecting Medicare receivables. The contingent fee

payment satisfies his claim for postpetition work for the estate and additional payment would

unjustly enrich Plaisance at the expense of unsecured creditors.

> b. *Plaisance Did Not Prove his Prepetition Claim Against J. Co.*

Plaisance's own testimony concerning his prepetition services for J. Co., combined with

other evidence in the record, undermined his claim and his credibility. The evidence established

---

[53] Plaisance was employed as special counsel on a contingent fee basis and paid in full despite his failure to disclose all his connections with J. Co. and its affiliates. See section I(a), above. The court's belated discovery of undisclosed relationships that bear on Plaisance's eligibility for employment may support disallowance and disgorgement of the compensation Plaisance has received. 11 U.S.C. §328(c); *see In re American International Refinery, Inc.*, 676 F.3d 455 (5th Cir. 2012) (affirming bankruptcy court's decision to order partial disgorgement of fees for attorneys' failure to adequately disclose connections to debtor and a creditor).

that Plaisance had conflicting prepetition allegiances because he simultaneously represented Julian Rish and numerous affiliated entities.  Specifically, Plaisance was an insider[54] of Rish Group because he was its secretary; an insider of J. Co., as its secretary/treasurer; and a minority shareholder of the Rish Group.  He also acknowledged at trial serving as Julian Rish's personal bankruptcy lawyer and that several Rish affiliates listed him as a creditor in their bankruptcies.

Plaisance testified at length about the services he claims to have rendered to J. Co. between 1998 and 2001 under an oral agreement with Julian Rish or J. Co.  His testimony was not corroborated by a representative of the debtor or debtor's putative counsel, Katherine Wheeler; nor did Plaisance offer evidence of his relationship with J. Co. by means of corroborating documents that he himself did not create.  Indeed, despite the large amount Plaisance claims J. Co. owed him at the date of bankruptcy, this debtor did not schedule Plaisance as a creditor.  The debtor's statement of financial affairs' identifying Plaisance as J. Co.'s secretary/treasurer supports an inference that although J. Co. knew of Plaisance, it did not consider itself liable to him for any amount.

Too, the provenance of the "statements" of services Plaisance offered in support of his pre-petition claim is dubious.  The statements were not attached to his original claim but only the amended claim filed a month later.  Additionally, no evidence established that the documents were created contemporaneously with the work Plaisance claims to have performed.  The absence of evidence supports the inference that Plaisance created the documents from his memory of events that took place from 12 to 15 years ago.  They are entitled to no weight in light of his testimony and the other evidence in the record.

---

[54]  *See* 11 U.S.C. §101(31) (an *insider* of a corporation includes its officers).

Beyond this, the evidence makes plain that Plaisance rendered legal services to Julian Rish, Rish Group and numerous entities Rish controlled, rather than to this debtor alone. The value of Plaisance's services to J. Co. is not obvious from the record and Plaisance has not advanced an explanation of why J. Co. should pay for his services to Julian Rish and other Rish affiliates. Indeed, the statements artfully lack any hint of a direct link to J. Co. such as by identifying litigation involving J. Co., or J. Co. employees, legal matters relating to J. Co., names of medical provider clinics purchased and a statement that J. Co. purchased the clinics.[55]

Plaisance's claim for services allegedly rendered to J. Co. before it was even incorporated also undermines his claims. Plaisance plainly could not have been J. Co.'s lawyer from 1998 through February 11, 2000, when it was incorporated. Instead, the "General Description of Legal Services Performed as General Counsel" admitted as Exhibit Plaisance 2 suggests that Plaisance's role all along was as counsel for Julian Rish and other entities Rish controlled, rather than solely for J. Co. For example, the 1998, 1999, 2000 and 2001 documents that are part of Plaisance 2 all mention review of "available documentation on twenty-seven (27) separate corporations which were financially managed by JCO [sic]…." Plaisance even admitted at trial that his work as legal counsel for J. Co. involved providing legal services for other Rish companies. He also testified that he spent long days – from 12 to 18 hours – performing due diligence while Rish Group was purchasing corporations and preparing documentation for the stock transfers.

---

[55] Absent evidence of a direct, tangible and provable benefit to J. Co. – which Plaisance has not proven – had J. Co. paid Plaisance for the work before it filed bankruptcy, the Trustee may have been able to recover those payments as fraudulent transfers under 11 U.S.C. §548, or transfers that created or increased J. Co.'s insolvency and revocable under 11 U.S.C. §544(b) and Louisiana Civil Code article 2036. In summary, even if Plaisance rendered the services listed on the statements, no evidence established that those services benefitted J. Co. alone or even primarily.

In combination, the evidence does not support Anatole Plaisance's right to a claim for legal services against J. Co.

    *c.  FTS Did Not Prove its Right to Payment as an Estate Professional*

Even if FTS had made out a case for *nunc pro tunc* consideration of its request for professional employment, the evidence belies the artful drafting in FTS's pretrial memorandum:[56] nothing in the record supports the finding or conclusion that J. Co. as debtor-in-possession hired FTS to perform services postpetition.  Rather, the evidence supports an inference that Julian Rish *personally* hired FTS to work for him, Rish Group and their affiliates.

Indeed, FTS's prior relationship with the debtor and its affiliates, as well as the likelihood that its services were not exclusively for the benefit of J. Co., militated against court approval of J. Co.'s hiring of FTS had approval been timely sought.  A professional seeking employment by a debtor-in-possession pursuant to 11 U.S.C. §327(a) must be a *disinterested person*.[57]  From the distance of 11 years, it is impossible to tell whether FTS was truly disinterested and whether its work benefitted J. Co., as opposed to Julian Rish personally or the Rish Group or other Rish affiliates, and therefore whether J. Co. should be liable for any share of FTS's fees.

Additionally, FTS is not entitled to compensation because it failed to prove that its services were necessary to the estate.  11 U.S.C. §503(b)(2), 330(a).  Weaver testified on cross-examination that Rish Group had 25-26 affiliates and subsidiaries in three states, and even conceded that FTS did not perform all of its work for J. Co.  FTS offered no credible evidence

---

[56]  Pretrail [sic] Memorandum in Support of Motion for Employment of Tax Consultant and Accountant Nunc Pro Tunc and in Support of Claims Number 25, 26 and 27 [P-349], pp. 1-2.

[57]  A *disinterested person* as set out in 11 U.S.C. §101(14) means "a person that – (A) is not a creditor of the debtor, an equity security holder, or an insider; (B) is and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate … by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."

that its work "was emergent and necessary to the estate because it was necessary to bring the financials of the Debtor and all the companies it financially managed into one cohesive picture for purposes of computing the tax liabilities of the Debtor and of the companies the Debtor financially managed after the filing of the bankruptcy."[58]  Weaver's uncorroborated testimony is entitled to no weight.

In contrast, the documentary evidence FTS offered does support a finding that Julian Rish, or Rish Group, is solely responsible for any fees FTS may be owed.  Specifically, Weaver's summer 2002 correspondence to Katherine Wheeler repeatedly described the consequences not to J. Co., but to Julian Rish *personally* and Rish Group, of failing to file federal tax returns.  The letters collectively cast doubt that FTS was rendering services for which J. Co. was liable at all.  Weaver's correspondence with Wheeler belies his testimony and supports a finding that J. Co. was not FTS's only – or even primary – Rish Group client.

In summary, FTS's relationship with Julian Rish and other corporations that Rish controlled rendered FTS not *disinterested* and so disqualified it for employment by the debtor in possession under 11 U.S.C. '327(a).  Even if FTS were disinterested and could be employed *nunc pro tunc*, FTS did not prove that any of its fees were actual and necessary to the J. Co. bankruptcy estate.  FTS performed services for Julian Rish and many Rish entities, and even the "statement" admitted as FTS Exhibit 2[59] provides no evidentiary support for any allocation of any part of those fees to J. Co.

---

[58]  Pretrail [sic] Memorandum in Support of Motion for Employment of Tax Consultant and Accountant Nunc Pro Tunc and in Support of Claims Number 25, 26 and 27 [P-349], p. 11.

[59]  Exhibit FTS 2 actually includes line items for work supposedly performed by FTS during a prepetition period from October 1, 2001 through January 15, 2002.  Despite this, and although Weaver testified that FTS performed a great deal of work for Rish Group subsidiaries including J. Co. between September 1999 and the bankruptcy filing, J. Co. did not list FTS as a prepetition creditor.

**Conclusion**

The evidence shows that: Anatole Plaisance is not entitled to a wage claim or a claim for administrative expenses under 11 U.S.C §§503(b)(3)(C) and (b)(4); Federal Tax Service is not entitled to *nunc pro tunc* employment as a tax consultant for the debtor J. Co. Management, Inc. or for the bankruptcy estate, and therefore is not entitled to an administrative expense claim; and neither Plaisance nor FTS has a valid and allowable timely or tardily filed unsecured claim.  The court by separate order will disallow claims 26 and 27 filed by Anatole Plaisance, deny FTS's Motion for Employment as Tax Consultant Nunc Pro Tunc and Application for Compensation and disallow FTS's claim 25.

Baton Rouge, Louisiana, November 6, 2013.

<u>**s/Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE